IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,                    No. 03:11-cr-00464-HZ

        Plaintiff,

    v.

ELLIS K. McCOY,                                         OPINION & ORDER

        Defendant.


Billy J. Williams
UNITED STATES ATTORNEY
District of Oregon
Seth D. Uram
ASSISTANT UNITED STATES ATTORNEY
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204

        Attorney for the United States

Ellis K. McCoy
Federal Register No. 73926-065
SPC Sheridan, Unit 5
Sheridan, Oregon 97378-6000

        Defendant Pro Se


1 - OPINION & ORDER

HERNANDEZ, District Judge:

On August 30, 2012, Defendant pleaded guilty to a Superseding Information charging him with conspiring to pay and accept bribes, accepting bribes, and filing false income tax returns. ECF 15, 18. He was sentenced on May 27, 2015. ECF 44. A Judgment of Conviction, and an Amended Judgment of Conviction, were filed on May 28, 2015. ECF 56, 58.

Defendant moves to vacate or correct his sentence under 28 U.S.C. § 2255. In connection with the motion, he moves for appointment of counsel. For the reasons explained below, no evidentiary hearing is required and the motion is denied. Defendant's motion for appointment of counsel is also denied.

I. Ineffective Assistance of Counsel

In his Plea Agreement, Defendant expressly "waive[d] the right to file any collateral attack, including a motion under 28 U.S.C. § 2255, challenging any aspect of the conviction or sentence on any grounds, except on grounds of ineffective assistance of counsel, and except as provided in Fed. R. Crim. P. 33 and 18 U.S.C. § 3582(c)(2)." ECF 20. During the plea hearing, Defendant confirmed, under oath, that he had read the Plea Agreement and understood it. ECF 22/Attach. 1 to Gov't Resp. 18, ECF 73-2 ("hereinafter "Plea Hearing"). He stated he had no problems understanding anything in the document. Id. at 7. Consistent with the Plea Agreement, Defendant's § 2255 motion is based only on an assertion that his counsel was ineffective. His challenge is limited to counsel's representation of him in connection with the sentencing phase. More specifically, he focuses on documents and information provided by the Government in its Sentencing Memorandum which were disclosed to Defendant shortly before sentencing and which Defendant alleges contained false and misleading information.

2 - OPINION & ORDER

II.  Standards for Ineffective Assistance of Counsel Claims

Courts use a two-part test to determine whether a defendant has received constitutionally deficient assistance of counsel.  Premo v. Moore, 562 U.S. 115, 121 (2011).  Under this test, a defendant must prove that counsel's assistance was deficient and that the deficient performance prejudiced the defense.  Id.; see also Schurz v. Ryan, 730 F.3d 812, 815 (9th Cir. 2013) (Defendant must show not only that counsel's performance was deficient but that the deficient performance prejudiced the defendant), cert. denied, 135 S. Ct. 141 (2014).

To prove the deficiency of counsel's performance, the defendant must show counsel made errors so serious that his "'representation fell below an objective standard of reasonableness'" under prevailing professional norms.  Stanley v. Cullen, 633 F.3d 852, 862 (9th Cir. 2011) (quoting Strickland v. Washington, 466 U.S. 668, 688 (1984)).  The court must inquire "whether counsel's assistance was reasonable considering all the circumstances" at the time of the assistance.  Strickland, 466 U.S. at 688.

In assessing whether counsel's performance was deficient, courts must "'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' and make every effort 'to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'"  Hibbler v. Benedetti, 693 F.3d 1140, 1149 (9th Cir. 2012) (quoting Strickland, 466 U.S. at 689).  Ultimately the defendant's "burden is to show 'that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'"  Harrington v. Richter, 562 U.S. 86, 104 (2011) (quoting Strickland, 466 U.S. at 687).

"To satisfy the prejudice prong under Strickland, a defendant must show 'a reasonable

3 - OPINION & ORDER

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Saesee v. McDonald, 725 F.3d 1045, 1048 (9th Cir. 2013) (quoting Strickland, 466 U.S. at 694). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Saesee, 725 F.3d at 1048 (quoting Strickland, 466 U.S. at 695).

The court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant[.]" Strickland, 466 U.S. at 697. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." Id.

III. Factual Background

A. The Plea Phase

In November 2011, Defendant was charged in a one-count Information with accepting bribes in violation of 18 U.S.C. § 666. ECF 1. He made his first appearance on December 8, 2011 at which time Assistant Federal Public Defender Thomas Price was appointed to represent him. ECF 5. Price represented Defendant throughout the entry of Judgment.

At the time of the offense conduct, Defendant worked for the City of Portland's Bureau of Transportation as the Parking Operations Manager and then the Transportation Division Manager. The offense conduct involved taking bribes in connection with the City's installation of "smart" parking meters.

In August 2012, Defendant was charged in a five-count Superseding Information. ECF 15. Count One alleged a conspiracy to pay and accept bribes in violation of 18 U.S.C. § 371. Id. Count Two alleged the acceptance of bribes in violation of 18 U.S.C. § 666. Id. Counts Three through Five alleged the filing of False Income Tax Returns for tax years 2006, 2007, and 2008,

4 - OPINION & ORDER

in violation of 26 U.S.C. § 7206(1).  Id.  Defendant waived indictment and pleaded guilty to all charges in an August 30, 2012 plea hearing.  A that time, he admitted, under oath, that he had been advised concerning the nature of each charge and the elements of each charge.  Plea Hearing 8.  He admitted that he was satisfied with the aid and advice provided by his lawyer throughout "this process."  Id. at 9.  He later stated that his guilty plea was not the result of force, threat, or intimidation.  Id. at 21.

As to the bribery-related conduct charged in the Superseding Information, Defendant agreed that the following facts were true:

> Counts one and two. [The Plea Petition] says you were employed as a - - at the Transportation Division Manager Parking Operations, Portland Bureau of Transportation, Portland, Oregon.  Your primary responsibility was for the day-to-day operation of the City of Portland's Smart Parking meter program.
>
> The City of Portland's Bureau of Transportation was a government agency that received in each calendar year federal benefits and/or federal assistance in excess of $10,000.  It says from approximately May 2002 through July 2011 you accepted and agreed to accept the bribes described in the superseding information from individuals identified in the superseding information as executive number one and executive number two.
>
> It goes on to say that you agreed to accept and accepted those bribes intending to be influenced and rewarded in connection with the business of and transactions of the City of Portland's Bureau of Transportation relating to the City of Portland's Smart Parking meter program.

Id. at 21-22.

The "bribes described" in the Superseding Information include the following allegations:

> 5.  From approximately January 2002 through July 2011, defendant Ellis K. McCoy, being an agent and employee of the city of Portland Bureau of Transportation, Executive #1, and Executive #2, combined, conspired and agreed to corruptly give (Executive #1 and Executive #2) and be influenced and/or rewarded (McCoy) in connection with the business of, and the transactions of, the City of Portland's Bureau of Transportation, a thing of value of $5,000 or more,

relating to the City of Portland's smart parking meter program, in violation of Title 18, United States Code, Section 666.

6.  It was part of the conspiracy that in 2002 and continuing to July 2011, Executive #1 paid some or all of the travel, lodging, meals, and greens fee expenses associated with golf trips defendant Ellis K. McCoy took to golfing destinations, including to Pebble Beach, California.

7.  It was part of the conspiracy that beginning in 2002 and continuing to July 2011, Executive #1 paid some or all of the travel, lodging, meals, and other expenses associated with gambling trips defendant Ellis K. McCoy took to casinos, including casinos located in Las Vegas, Nevada.

8.  It was further part of the conspiracy that beginning in 2003 and continuing to July 2011, Executive #1 paid for some or all of the travel, lodging, and meals expenses associated with vacation trips by defendant Ellis K. McCoy, including vacation trips to New Orleans, Louisiana, Honolulu, Hawaii, and Paris, France.

* * *

12.  It was further part of the conspiracy that Executive #1 made payments to defendant Ellis K. McCoy in return for defendant McCoy speaking favorably about the products and services of Company #1 and, later, Company #1A to public employees in cities other than Portland involved in the decision about which companies to use to supply products and services relating to smart parking meters.

* * *

15.  It was further part of the conspiracy that in return for the payments from Executive #1 and Executive #2, defendant McCoy, acting in his capacity as the Transportation Division Manager, Parking Operations, Portland Bureau of Transportation, assisted Executive #1 and Executive #2 in securing for their respective companies contracts and contract expansions with the City of Portland for products and services related to the City of Portland's smart parking meter program.  Such assistance took the form of, among other actions: 1) providing advice to Executive #1 and Executive #2 concerning the drafting of contract proposals to be submitted to the City of Portland; 2) participating in the drafting and submitting of reports and recommendations to the Portland City Council concerning city action in awarding contracts to Company #1 and Company #1A, and 3) testifying before the Portland City Council in favor of awarding contracts and contract expansions to Company #1 and Company #1A, each such instance of

assistance being a separate overt act.

* * *

     17(b).  In July 2003, Executive #1 paid the expenses associated with a three-day trip to France for defendant McCoy[;]

* * *

     17(d).  From approximately June 2002 and continuing to July 2011, Executive #1 paid some or all of the travel, lodging, meals, and other expenses associated with golfing trips, gambling trips, and vacation trips for defendant Ellis K. McCoy, each such payment being a separate overt act.

ECF 15; see also id. at ¶¶ 9-11, 13-14 (alleging that Executive #1 made payments to McCoy ).

At the plea hearing, Defendant agreed that these allegations were true statements.  Plea Hearing 22.  He agreed he "[d]id . . . those things[.]"  Id.

As part of the plea hearing, I asked the Government to explain the elements of the crimes and what evidence the Government would have relied on if the case had gone to trial.  Id. at 23.  In response, the Government discussed the elements and then explained that it would offer documentary and testimonial evidence.  Tr. 23-24.  The documentary evidence would include records seized from Defendant's office and home, records of activity from his bank accounts, records from the City, records obtained from the company identified as 1A, bank records and credit card records of Executive #1, and certain public records.  Id. at 24-25.  Testimonial evidence would include witnesses from the City, the FBI agent who conducted the investigation, an FBI financial analyst , and an IRS agent.  Id. at 25-26.  Based on the evidence and financial analysis, the Government intended to show that the total amount of check and cash payments Defendant received from Executive #1 and Executive #2 was approximately $164,500.  Id. at 29.

The Government's representation that the check and cash payments equaled

approximately $164,500 was based on the parties' stipulation in the Plea Agreement that "[t]he defendant and the government agree that the total bribe amount pursuant to sentencing guideline section 2C.1.1 is $164,567 paid in checks and currency plus the value of travel, meals, lodging, and other expenses of an undetermined amount." Plea Agrmt. ¶ 7. The parties further agreed that "the total bribe for sentencing guidelines calculation purposes is less than $200,000." Id. Based on that stipulation, the Plea Agreement contemplated, as to Counts 1 and 2, a base offense level of fourteen, plus an additional two levels for more than one bribe, and an additional ten levels for the amount involved being somewhere between $120,000 to $200,000. Id. at ¶ 9. In the Plea Agreement, the Government agreed to recommend the low end of the applicable sentencing guideline range. Id. at ¶ 12.

At the Plea Hearing, I confirmed with Defendant that the amount at issue for the bribe-related charges was $164,567, and for guideline purposes, was less than $200,000. Plea Hearing 18. Defendant understood what that meant. Id. He had no questions about the calculation of offense levels as provided in the Plea Agreement. Id. I also confirmed with Defendant that ultimately, I would determine his sentence. Id. at 13. He had no questions about that issue. Id.

At the conclusion of the plea hearing, Defendant pleaded guilty to each of the five counts. Id. at 31-32. I found that the plea was given freely and voluntarily and I accepted the plea. Id. at 32. I set sentencing for November 26, 2012. Id.

B. The Sentencing Phase

Based on the parties' joint request, sentencing did not occur until May 27, 2015. Before the sentencing hearing, the Government submitted a Sentencing Memorandum with several exhibits. ECF 52. Defendant also submitted a comprehensive Sentencing Letter which was

shared with the Government but not docketed.  The Government amended its Sentencing

Memorandum to correct an error.  ECF 54.

The exhibits attached to the Government's Sentencing Memorandum consisted of emails

and a few text messages between McCoy and George Levey[1] or between Levey and executives

with his company, spanning from March 2005 to mid-2011.  Gov.'t Sent. Mem., Exs. 1-28

(hereinafter "the Levey emails").  They were offered to show Defendant's manipulation of the

contract process in favor of Levey's company, how Defendant protected Levey's company from

complaints of poor performance, and how Defendant advocated for Levey's company when

talking to parking meter managers in other cities.

One part of the Government's Sentencing Memorandum addressed the travel,

entertainment, and meal bribes.  Gov't Sent. Mem. 4-6.  Based on the parties' agreement that the

cash and check bribes totaled $164,567 and the additional agreement that the total amount was

less than $200,000, the Government represented that McCoy agreed that he took bribes in the

form of travel, entertainment, and meals of not more than $35,400 total.  Id. at 4.  The

Government's description of these bribes began with the assertion that shortly after the City

awarded its first contract for smart parking meters in early 2002 to Schlumberger, the company

which employed Levey as its United States smart meter sales representative, Levey took McCoy,

an avid golfer, on a golfing trip to a resort in Phoenix to reward McCoy for Schlumberger getting

the $6.8 million contract.  Id.  The Government then asserted that over the next nine years,

McCoy and Levey traveled together frequently, with Levey usually paying some or all of

McCoy's travel expenses, meals, and entertainment.  Id.  After Levey worked for Schlumberger,

---

[1]  Levey was identified as Executive #1 in the Superseding Information.

9 - OPINION & ORDER

he then incorporated Cale Parking Systems, US, established its headquarters in Florida, and became its president and owner.  Id. at 3.  Sometimes, Levey paid for McCoy to travel without him, and sometimes to promote Cale, Schlumberger's competitor.  Id. at 3, 4.

The Government listed sixty-one of "these trips" in a table (hereinafter the "Trip Bribe Chart").  Id. at 4-6.  The Government identified the trips from emails between McCoy and Levey, from records seized at Levey's company, from Levey's credit card statements and other financial records, and from McCoy's financial records.  Id. at 4.  The table included, for each trip, the trip date, the trip location, and the amount that Levey or his company paid.  Id. The Government specified actual amounts for only six of the trips.  Id. at 4-6.  The amounts for the other fifty-five trips are listed as unknown.  Id.  Several of the trips listed by the Government were to places Defendant had previously agreed were part of the offense conduct.  See id. (July 29, 2002 trip to Paris; August/September 2002 trip to Pebble Beach; July 2003 trip to New Orleans; August 2003 trip to Honolulu; and trips to Las Vegas in 2003, 2004, 2006, 2008, and 2010).

According to an Affidavit submitted by Price in response to Defendant's § 2255 motion, on May 12, 2015, the Government notified Defendant's counsel that it would be introducing new email evidence at Defendant's sentencing hearing.  Gov't Resp. to Def.'s § 2255 Mot., Ex. 3 ("Price Affid.") at 4.  The Government provided copies of the Levey emails to Defendant's counsel on May 18, 2015.  Id.  Price states that he emailed the Government's counsel, contending that the emails should have been provided much earlier.  Id.  He also raised a question as to whether or not a continuance was warranted or whether the material should be stricken from consideration at sentencing.  Id.  In response, the Government's attorney told Price that the FBI had only recently provided the emails to him.  Id.  Defendant has no records of this

communication between Price and the Government's attorney. He asserts that Price's statement about sending an email inquiring about a continuance is not credible. Def.'s Reply 10, ECF 77.

Price explains that after reviewing the Levey emails, he concluded that their contents were not inconsistent with what the defense team, including Defendant, had already understood and concluded: that Defendant had influenced the process that resulted in Cale obtaining the winning bid for the smart parking meter contract. Price Affid. 5. Price states that he discussed the matter with the defense team, further researched the issue, discussed the matter with other attorneys in his office, and talked to Defendant. Id. They decided to stick with their previously-agreed upon sentencing strategy. Further, Price asserts that on May 20, 2015, Defendant had the opportunity to review the emails in a two-hour meeting. Id. at 7. Defendant remembers discussing only one of the emails at that meeting. Def.'s Reply 10.

Price asserts that in the May 20, 2015 meeting, and in another two-hour meeting on May 26, 2015, the defense team and Defendant agreed to stick to the May 27, 2015 sentencing date, and to adhere to their strategy which was designed to try to keep Defendant out of prison. Id. at 7. The strategy was to focus on the fact that Defendant sincerely believed in the product and wanted to achieve the best service for the best price for the City. Id. They intended to show a lifetime of Defendant's positive character and his efforts at rehabilitation and reform. Id. They also did not want to refute what was already conceded. Id.

At the sentencing hearing, I interrupted the Government's attorney to clarify the value of the bribes. The following exchange occurred:

> THE COURT: It's my understanding the value of the cash was around $164,000 and some change. Am I right about that?

MR. URAM: Yes, Your Honor.

THE COURT: And then the value of all the wining and dining and vacation and golf trips and all that was not - - you weren't able to determine it, but did I see a number of around $35,000 in there for at least part of that?

MR. URAM: What you saw, Your Honor, was a reference to the plea agreement, where we have stipulated that the total bribe amount - - pardon me, - - is not more than $200,000. And that means that if the cash and check bribes were about $164,000, all the wining and dining and trips can't be more than approximately $35,000.
    We were able to calculate much less - - document much less based on the reports we put together. And that's shown in the chart that starts, I think, on page 4 of our sentencing memo.

THE COURT: And when you say you were able to calculate less, that's because there were actual receipts and stuff, and that's what you were able to calculate. And then for the others, there was a lot of unknown how much was spent. And I take it those were left out of the math.

MR. URAM: That's correct.

THE COURT: So what you stipulated to was - - and there were a lot of trips and dinners and all that other stuff, just based on some gross estimate, that it was less - - because of the $200,000 limit, you're just guessing what that number might be. It could be more; it could be less.

MR. URAM: The way you put it, yes. But we stipulated that it was a total of less than $200,000 because if we can't prove it, the benefit of the doubt goes to the defendant, in my view. And so we arrived at what I believe was a fair stipulation based on what we had available to us.

THE COURT: All right. Thank you.

ECF 59/Attach. 2 to Gov't Resp. 7-8, ECF 73-4 (hereinafter "Sent. Hearing").

Price, consistent with the defense team strategy, opened his remarks by stating that Defendant's "character and circumstances warrant a sentence of probation, and that is what we will be asking for." Id. at 11. He noted that Defendant was a "profoundly different person" than he was four years earlier and that he had consistently taken responsibility for his conduct. Id. He

also remarked that as much as Defendant "influenced the process, which we admit he did - - and

it was an unfair, tainted process, which we admit - - he did always endeavor to get the best deal

he could for the City." Id. at 12.  In regard to the trips, Price stated:

> A number, and a significant number of the trips that the Government referred to
> between pages 2 and 6 of its memo include trips that the City of Portland paid for.
> Some of those unknown numbers are City of Portland trips.  Some of those
> unknown numbers are duplicates with the other information.  Some of those
> unknown numbers are also trips that Mr. McCoy paid out of his own pocket.

Id.

During Defendant's allocution, Defendant explained that he was motivated by his desire

to make the parking program successful and sustainable, he worked hard at his job, and he

"rationalized that I could continue my close relationship with vendors as long as I demanded and

received positive results for Portland." Id. at 25.  Continuing, he explained that "[s]ome of those

relationships included, you know, taking trips, but I paid for the majority of those vacations back

and forth down to see them, because I considered them mistakenly, friendships." Id. at 12-13.

After the conclusion of remarks by the Government, Price, and Defendant, I sentenced

Defendant to twenty-four months on Count 1 and on Count 2, to be served concurrently with the

sentence imposed on Count 1.  Id. at 32.  The Sentencing Guideline range for Count 1 was forty-

six to fifty-seven months.  Id.  The Government sought a thirty-month sentence.  Id.  I concluded

that a twenty-four month sentence was sufficient but not longer than necessary to accomplish the

goals of sentencing.  Id.  I also sentenced Defendant to twelve months on each of Counts 3, 4,

and 5, with all of that time to be served concurrently with the sentences imposed on Counts 1 and

2.  Id.

IV.  Discussion

13 - OPINION & ORDER

Defendant raises three separate grounds for relief.  First, he contends that Price was ineffective for failing to obtain more time to evaluate the Levey emails which were disclosed shortly before the sentencing hearing.  Def.'s § 2255 Mot. 5, ECF 60; Def.'s § 2255 Mem. 2-3.  Second, he alleges that Price was ineffective for allowing the Court to consider, at sentencing, evidence that was prejudicial to Defendant.  Id. at 6; Def.'s § 2255 Mem. 3-7.  Third, he alleges that Price was ineffective for refusing to accede to Defendant's request during the sentencing hearing to respond to the Government's information and my questions about the Trip Bribe Chart.  Id. at 7; Def.'s § 2255 Mem. 7-8.

A.  Ground One:  Failure to Seek Additional Time

Defendant argues that Price was constitutionally ineffective for failing to seek a continuance of the sentencing hearing to allow the defense team more time to review and consider the Levey emails and the Trip Bribe Chart.  The parties agree that Defendant met with counsel to review the emails on May 20, 2015, although Defendant states he remembers discussing only one of the emails.  Defendant does not dispute that the defense team met again and discussed the emails again, on May 26, 2015.  Defendant challenges Price's assertion that he emailed the Government's counsel upon initially receiving the Government's Sentencing Memorandum with the Levey emails and the Trip Bribe Chart, to discuss the late disclosure of the emails and to discuss a possible continuance.  For the purposes of this motion, I assume the facts in Defendant's favor and proceed on the assumption that Price did not discuss a possible setover with the Government.

Putting aside Defendant's mistaken reference to the Federal Rules of Civil Procedure, Defendant is correct that Price could have requested a setover of the May 27, 2015 sentencing

hearing. <u>See</u> Fed. Rule Crim. P. 32. But, Price is correct that a setover would not have affected the admissibility of the Levey emails or the Trip Bribe Chart. <u>See</u>, <u>e.g.</u>, <u>United States v. Lizarraga-Carrizales</u>, 757 F.3d 995, 1000 (9th Cir. 2014) ("sentencing courts are not limited to evidence that would be admissible at trial"), <u>cert. denied</u>, 135 S. Ct. 1191 (2015); <u>United States v. Vanderwerfhorst</u>, 576 F.3d 929, 935 (9th Cir. 2009) ("Hearsay evidence of unproved criminal activity not passed on by a court . . . may be considered in sentencing.") (internal quotation marks and brackets omitted); <u>United States v. Felix</u>, 561 F.3d 1036, 1042 (9th Cir. 2009) (noting that the Sentencing Guidelines provide that "[i]n determining the relevant facts, sentencing judges are not restricted to information that would be admissible at trial," and that a court may consider any information, "so long as it has sufficient indicia of reliability to support its probable accuracy" (citing U.S.S.G. § 6A1.3, Cmt.); further stating that "a sentencing judge may consider a wide variety of information which would not be considered admissible at trial.") (internal quotation marks and brackets omitted).

Although Defendant argues that the failure to seek a continuance prejudiced him, he does not deny that the defense team's overall strategy at sentencing was to keep him out of prison by focusing on the following: (1) his actions were motivated by a desire to benefit the City; (2) the City suffered no financial harm; (3) his conduct was aberrant when considered in the context of a lifetime of hard work and professionalism; (4) he was remorseful and had reformed; and (5) he suffered from an illness which would be hard to treat in prison. <u>See</u>, <u>e.g.</u>, Price Affid. 5-6 (describing that they decided to focus on positive aspects of Defendant's lifelong character, that "his course of conduct was an aberration from his lifelong pattern of hard work and professionalism," that Defendant had strived to achieve the best product at the best price for the

City, and that he was remorseful and had reformed); Sent. Hearing 4 (Government attorney

noting that a "fair amount" of Defendant's request for probation was based on Defendant's

medical condition).

It is undisputed that Defendant was concerned about the timing of the disclosure of the

Levey emails and their contents.  He was also concerned about the Trip Bribe Chart and its

alleged over-representation of the number of trips that were paid for in whole or in part by Levey.

See Def.'s § 2255 Mot. & Mem., Ex. 2 (email exchanges between Defendant and Price regarding

inaccuracies).  However, as Price explains, in his opinion, the contents of the emails were not

inconsistent with what the defense team had already understood and concluded - that Defendant

had influenced the process that resulted in Cale obtaining the winning bid for the smart parking

meter contract.  Price Affid. 5.  Moreover, Price was concerned that engaging in a dispute or

argument about the details of the Levey emails would not only undermine the sentencing

strategy, but could negatively affect the parties' agreement for a reduction in offense level

calculations for acceptance of responsibility.  That is, because challenges to the contents of the

emails could viewed as effectively attacking the very conduct to which Defendant had already

pleaded guilty, Price was justifiably concerned about the impact such challenges could have on

sentencing.  See Price Affid. 6 ("My defense team and I wanted to avoid arguing about the emails

because to do so would tend to contradict facts Mr. McCoy had already admitted. . . . We had

already conceded [the fact of his involvement in influencing the process to ensure Cale won the

contract] as part of Mr. McCoy's plea agreement.  We also believed delaying sentencing would

provide no strategic benefit to Mr. McCoy.").

Considering all of the evidence, Price's decision not to challenge the contents of the

emails was not unreasonable.  In analyzing an ineffective assistance of counsel claim, an attorney's strategic decisions are given deference, and it is not for this Court to second guess those decisions.  Strickland, 466 U.S. at 689; Elmore v. Sinclair, 799 F.3d 1238, 1250 (9th Cir. 2015) (explaining that "[a]s long as defense counsel uses a 'sound trial strategy,' employing that strategy does not constitute deficient performance"; rejecting arguments which were "little more than a challenge to [defense counsel's] trial strategy with the benefit of hindsight"), pet. for cert. filed, (U.S. Jan. 27, 2016) (No. 15-7848); see also Zapien v. Martel, 805 F.3d 862, 872 (9th Cir. 2015) ("strategic choices made after thorough investigation of the law and facts . . . are virtually unchallengeable") (internal quotation marks omitted).  Price reviewed the emails, consulted his defense team, talked to his client, and weighed the pros and cons of attacking them.  The risks he assessed were more than speculative.  His strategy was within the range of reasonable decisions competent counsel would consider.  Given Price's decision not to dispute the emails, there was no need to seek a continuance.  As Price states, he had sufficient time to prepare for sentencing, including examining the new evidence.  Thus, his decision to not seek a continuance of the sentencing hearing for purposes of further evaluating the Levey emails was not ineffective.

Moreover, Defendant's argument that he was prejudiced by Price's conduct in this regard misses the mark.  Defendant states that Price did not give him the time to counter the misrepresentations contained in the emails.  Def.'s Reply 11.  This assertion is belied by the emails exchanged between Defendant and Price from May 21, 2015 to May 25, 2015 in which Defendant refers to inaccuracies in the Government's Sentencing Memorandum.  It is also belied by the fact that there are only twenty-eight emails, many with only a few sentences, and at least two of which Defendant sent or received.  Thus, it should not have taken more than a couple of

hours to review the emails and assess them for inaccuracies.  However, for the purposes of this

motion, I accept Defendant's assertion that he did not have adequate time to counter the emails.

But, the only prejudice asserted as a result of that alleged lack of time is that Price failed to

respond to the content of the emails to correct alleged misrepresentations and did not allow

Defendant to "counter the misrepresentations of the last minute email evidence[.]"  Def.'s Reply

11 (arguing that the Government's characterizations were inaccurate and were

misrepresentations).  This argument is essentially the same argument Defendant raises in support

of Ground Two:  that Price allowed the Court to consider the evidence at sentencing.  I address

the argument below, in discussing Ground Two.

As to the Trip Bribe Chart, the record shows that despite not seeking a continuance,

Defendant was able to provide Price with information as to which trips were part of the bribe

conspiracy and which were not.  Def.'s § 2255 Mot. & Mem., Ex. 2 (emails from Defendant to

Price from May 21, 2015 to May 25, 2015 providing information); Id. at 9 (attached chart to May

25, 2015 email); Id., Ex. 3 (copy of chart created by Defendant including information on each of

the sixty-one trips included in the Trip Bribe Chart).  Thus, the record fails to establish that

Price's failure to seek a continuance on the basis of the Trip Bribe Chart prejudiced Defendant's

ability to provide accurate information to Price or prejudiced Price's ability to use that

information.

B.  Ground Two:  Allowing the Court to Consider Prejudicial Evidence

Defendant argues that Price was ineffective for not addressing the Trip Bribe Chart and

the Levey emails at sentencing.  Defendant argues that by allowing me to consider the evidence,

several misrepresentations in the Government's Sentencing Memorandum were left

unchallenged.  As a result, he asserts that various misrepresentations of fact prejudiced him at sentencing.

Defendant's arguments lack merit.  First, as explained in the previous section, Price made a strategic decision to focus on other arguments in support of a sentence of probation.  He correctly assessed the Levey emails as consistent with the facts and scheme to which Defendant had already pleaded guilty.  He correctly assessed that the details of the trips as outlined in the Trip Bribe Chart were generally irrelevant as long as the Government adhered to the $200,000 monetary limit.   It was reasonable for Price to forego contesting what Defendant alleges were misrepresentations in order to keep the Court's attention on the arguments that had a greater chance of persuading the Court to impose a sentence of probation.

Second, Price did raise the issue of inaccuracies in the Trip Bribe Chart in his sentencing presentation.  Sent Hearing. 12 (expressly referring to the Trip Bribe Chart at pages two through six of the Government's Sentencing Memorandum and explaining that the trips included trips paid for by the City, paid for by Defendant himself, or duplicates of other bribe information).  Thus, he did, in fact, bring those alleged misrepresentations to the Court's attention.

Additionally, Defendant's argument concerning the alleged misrepresentations in the Levey emails is actually directed to the Government's interpretation of those emails and what they purportedly show.  In his Reply Memorandum, Defendant cites to page twelve of the Government's Sentencing Memorandum and the statement made by the Government there that "[i]n September 2005, McCoy required Cale to sign an extension to its free trial, but he did this not to benefit Portland, but to benefit Levey and Cale." Gov't Sent. Mem. 12 (cited at Def.'s Reply 11).  In support of this statement, the Government quoted from a September 16, 2005

email from Levey to Cale's senior executives in Sweden.  Id. (citing to Gov't Sent. Mem., Ex. 3).
Defendant argues that in fact, Cale did not receive a benefit from the contract extension and
instead, all the benefit went to the City which received financial benefit from the pilot program.
Def.'s Reply 11.  Defendant offers his interpretation of events and asserts that the Government
misrepresented that he was not working for the City.  Id.

In another example, Defendant cites to a statement by the Government in its Sentencing
Memorandum that the "last documented instance of McCoy trying to help Cale obtain a contract
with the City of Portland came in June 2011."  Gov't Sent. Mem. 18.  In support, the Government
cited to a June 22, 2011 text message sent by Levey which referred to Ellis and Ellis's plan to
wait on the application, then write an "RFP" to support it which would be the "start we need" and
be "[i]ncentive enough to get launched."  Id. (citing Gov't Sent. Mem., Ex. 18).  Defendant
argues that the references here are to charging stations and cell phone payment capabilities and
that pay station "RFP's" are "designed to encourage the vendors to provide the City with future
enhancements that work with their pay stations['] proprietary software."  Def.'s Reply 11.
Defendant argues that the Government's statement in its Sentencing Memorandum is a
misrepresentation.

The problem here is that Defendant does not argue that the Levey emails themselves were
inaccurate or contained misstatements of fact.  Defendant's issue is with how the Government
made use of the Levey emails in its Sentencing Memorandum.  The Sentencing Memorandum is,
however, argument.  It is the Government's interpretation of the underlying facts.  In reviewing a
Sentencing Memorandum, the Court is aware that it is a non-neutral expression of advocacy.
That Price did not expressly challenge the Government's construction of the chain of events

cannot be viewed as unreasonable given that Defendant did not dispute the authenticity of the Levey emails or the accuracy of their contents. Price recognized that some of the details of the scheme as outlined by the Government in reliance on the Levey emails were insignificant given that Defendant had already admitted his participation in the scheme and that the scheme lasted through July 2011. This recognition was consistent with a decision by competent, not incompetent, counsel. Further, Defendant's own Sentencing Letter spent considerable time arguing that although Defendant accepted bribes, he was always motivated by a desire to obtain the best deal for the City. I was well aware of Defendant's position on this issue.

Third, Defendant argues that he was prejudiced, but he offers no evidence in support of this assertion. As noted above, the guideline range was forty-six to fifty-seven months. The Government recommended thirty months. Defendant received twenty-four months, about one-half of the low end of the guideline range. If Defendant is suggesting that without the Levey emails or the Trip Bribe Chart he would have received less prison time, he is wrong.

At the sentencing hearing, I clarified that the Government was unable to prove the value of the trips other than approximately $35,000, the difference between the $164,567 in admitted cash/check bribes, and the $200,000 ceiling. I also confirmed that the Government was able to actually calculate less than $35,000. I noted that there were a lot of trips, but I ensured that the Government was just "guessing what the number might be. It could be more; it could be less." Sent. Hearing 8. This, combined with Price's representation that the Trip Bribe Chart was over-inclusive and inaccurate, establishes that I did not rely on a specific number of trips in my sentencing decision, I knew that the number of trips was a guess, and that what was most important was the $200,000 threshold.

21 - OPINION & ORDER

I also made clear that my sentencing decision was informed not by the number of trips or various details revealed in the Levey emails, but by the length of the scheme, the extent of the scheme in terms of having setting up a separate entity in which to surreptitiously funnel bribe payments, and the breach of the public trust. I noted Defendant's emphasis on the lack of financial harm to the City. Id. at 28 ("Much has been made in this case about how, when we looked at the result, the City of Portland got perhaps the best deal that they could have gotten notwithstanding, perhaps because of Mr. McCoy's efforts."). As I stated then, "[t]hat's not the point." Id. Rather, my concern was that Defendant, a public employee, had rigged the competitive bidding process and that by doing so, had "brought into question" the "whole reputation of the community[.]" Id. at 28-29. Defendant's conduct ran counter to society's expectation that city employees do their best to make sure that the system is fair, "for everybody." Id. at 29.

Then, I noted that the "other aspect of this case that is remarkable to me" was that the bribe scheme lasted ten years. Id. (referring to the years 2002 and "extending to 2010, 2011"). The years, as noted above, were agreed to by Defendant at his plea hearing. Further, I remarked on the "sophisticated" nature of the bribe-giving and taking, "with the creation of this enterprise in order to help hide what was going on." Id. Rather than attribute the scheme to ego and ambition as suggested by Defendant, I concluded that Defendant "was just being greedy" by "taking advantage of favors and money that was offered to him in exchange for tilting the board." Id.

Further, I acknowledged several points Defendant made in support of a sentence of probation. Id. at 30. I noted the many positive things one could say about Defendant's character,

22 - OPINION & ORDER

that the likelihood of re-offending was low, and that it would be a challenge for the Bureau of

Prisons to provide adequate medical care to Defendant.  Id.  I acknowledged the impact a prison

sentence would have on Defendant's family members.  Id.  However, as I explained:

> But when I evaluate everything that has happened in this case, I am left with the
> conclusion that Mr. McCoy has to go to prison based on these circumstances.  I
> am required to consider the guideline range, as I've already stated, as set forth in
> the presentence report.
>
>    I'm required to address a sentence that looks at the nature and
> circumstances of this offense.  I have already discussed that.  I'm required to
> consider Mr. McCoy's history and characteristics.  I've already described those.
>
>    I have described why this is a serious offense and what it has done to the
> public and confidence in our system.  Notwithstanding the other points that have
> been made by the defense, that they didn't suffer - - that the City of Portland didn't
> suffer a monetary loss as a result of these, there's still a loss.  There's a loss in
> confidence on the part of the public vis-à-vis the City of Portland as a result of
> these kinds of events.  It's devastating.
>
>    I need to consider, also, beyond the seriousness of the offense, promoting
> respect for the law and providing just punishment[.]

Id. at 30-31.

Defendant cannot point to anything in the record creating the inference that but for Price's

failure to more forcefully challenge the Government's argument in its Sentencing Memorandum

and the Levey emails on which the argument was based, and the Trip Bribe Chart, his sentence

would have been different.  Suggesting that without this information he would have received a

sentence lower then twenty-four months is complete speculation.  Thus, Defendant fails to

establish that but for Price's alleged unprofessional errors, the outcome of his sentencing would

have been different.

In summary on Ground Two, Defendant fails to establish that Price's strategic decisions

to emphasize the arguments in favor of a sentence of probation, to not expressly challenge the alleged misrepresentations in the Levey emails, and to not dwell on the over-inclusive number of trips in the Trip Bribe Chart, were unreasonable and amount to constitutionally ineffective assistance of counsel.  Even assuming Price's decisions were error, Defendant fails to demonstrate prejudice because the record establishes that the alleged misleading information presented by the Government in its Sentencing Memorandum did not affect the sentence he received.

C.    Ground Three:  Price's Failure to Accede to Defendant's Request
      During Sentencing to Challenge the Evidence

Although Defendant raises this as a separate basis for relief, the previous discussion makes clear that Price provided constitutionally adequate representation and even if he erred, Defendant fails to establish prejudice.  The only point to add here is that while Price advised Defendant to avoid challenging the Levey emails and the Trip Bribe Chart during the sentencing hearing, Defendant had the opportunity to speak with the Court and make any statement he desired.  He did, in fact, state that he himself had paid for the majority of his vacations.  He did not, however, raise a more specific objection to the evidence.  That was Defendant's choice.

/ / /

/ / /

/ / /

/ / /

/ / /

CONCLUSION

Defendant's Motion to Vacate or Correct Sentence under 28 U.S.C. § 2255 [60] is denied.

Defendant's motion for appointment of counsel [67] is denied.   The Court declines to issue a

Certificate of Appealability on the basis that petitioner has not made a substantial showing of the

denial of a constitutional right pursuant to 28 U.S.C. § 2253(c)(2).

IT IS SO ORDERED.

Dated this ____ day of _____, 2016

_____
Marco A. Hernandez
United States District Judge

25 - OPINION & ORDER